**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:14-cr-159 (LMB)** |
| | ) | **Hon. Leonie M. Brinkema** |
| **IN SEON LIM** | ) | |
| | ) | **Sentencing Date:  October 24, 2014** |
| Defendant. | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The defendant, In Seon Lim, by and through counsel, respectfully submits this memorandum in aid of sentencing.  Mr. Lim has reviewed the Presentence Report ("PSR") in this case and has no objection to its factual narrative or advisory guideline range, with the exception of an objection to the proposed leadership enhancement under § 3B1.1, which is explained in further detail, below.[1]

Mr. Lim recognizes that his crimes are very serious.  He has accepted full responsibility for his actions, and he is "ready to do everything [he] can to answer for [his] crimes and then to move forward with putting [his] life back together and becoming a positive contributing member" of his family and society once more.  Ex. A (Statement of Responsibility).  Mr. Lim has already taken strides to rehabilitate himself, by cooperating fully in the government's ongoing investigation of related crimes and by "cut[ting] off all ties to [his] former life."  *Id.*

Mr. Lim has no criminal history, and—given his age and lengthy course of prior lawful conduct—poses almost no risk of recidivism.  He is a family man, who has borne "the burden and responsibility" of leading his immediate and extended family since his parents, aunts, and

---

[1]  The government joins Mr. Lim in this objection to the extent that it seeks only a two level role enhancement; Mr. Lim respectfully suggests that a leadership enhancement is neither necessary nor appropriate based on the facts of his case.

uncles came to the United States as unskilled workers when he was very young.  Ex. B (Letter from In Su Lim).  And he is a kind but firm parent, who has worked hard to raise his own children well.  *E.g.*, Ex. B; Ex. C (Letter from Ashley Lim); Ex. D (Letter from Alyssa Lim).

The sprawling contracting fraud scheme that Mr. Lim became involved in has received significant news coverage over the past several years—with a particular focus on its ringleader, Kerry Khan, who accepted over $12 million in bribes (more than *24 times* the amount accepted by Mr. Lim) and who was owed an additional $14 million in delayed payments from corrupt contractors at the time of his arrest.  *See* Statement of Offense, *United States v. Khan*, No. 11-cr-276-EGS ¶ 31 (D.D.C. May 17, 2012) (hereinafter "Khan Stmt of Offense"); *cf.* Statement of Facts, *United States v. Lim*, No. 14-cr-159-LMB ¶ 14 (E.D. Va. July 31, 2014) (noting that Mr. Lim accepted "things of value totaling over $490,000" through his involvement in the scheme).

Given his substantial cooperation with the government's ongoing investigation, the significant general deterrence that has already been accomplished through the numerous highly publicized convictions related to this case (18 and counting), his limited role in relation to the larger fraud scheme, the inherent flaws in the bribery sentencing guidelines, and the absence of any need to further deter Mr. Lim himself—who has "been living in a prison, just without bars" since Khan's scheme first started to unravel three years ago, *see* Ex. B—Mr. Lim respectfully submits that a sentence of 36 months is more than adequate to satisfy the purposes of sentencing here.

The government has filed a motion for reduction of sentence pursuant to § 5K1.1; we ask the Court to grant that motion and to take into account Mr. Lim's efforts to return to the values he learned from his parents, in part by cooperating fully and providing the government with substantial assistance in its ongoing investigation.  The need for punishment must be balanced

against Mr. Lim's personal history and his efforts to redeem himself.  Accordingly, we respectfully submit that a sentence of 36 months would be sufficient but not greater than necessary to achieve the purposes of sentencing in this case.

## LEGAL STANDARD

Before sentencing Mr. Lim, this Court must carefully weigh each of the statutory sentencing factors set forth in 18 U.S.C. § 3553(a) and exercise its independent discretion to craft the shortest sentence that is "*sufficient, but not greater than necessary*," to accomplish the purposes of sentencing, as set forth in § 3553(a)(2).  18 U.S.C. § 3553(a) (emphasis added).

The Supreme Court has emphasized that a "Guidelines" range based on the United States Sentencing Commission Guidelines Manual *cannot* be substituted for a sentencing court's independent sentencing determination:  "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."  *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original); *see also Kimbrough v. United States*, 552 U.S. 85 (2007) (confirming that the Guidelines "are advisory only").

After careful consideration of the seven co-equal factors set forth in § 3553(a), the Court is free to conclude that a case falls outside the "heartland" contemplated by the Guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless."  *Rita v. United States*, 551 U.S. 338, 351 (2007).  While the sentencing court must begin its analysis by correctly calculating the advisory range, the court is then free simply to disagree, based on the statutory sentencing factors, with the Guidelines' "rough approximation" of the appropriate sentence for any given case.  *Id.*

## ARGUMENT

**I.      Mr. Lim Objects to A Leadership Enhancement Under U.S.S.G. § 3B1.1.**

Mr. Lim recognizes that the government has filed a motion to reduce sentence pursuant to

§ 5K1.1 in this case, which mitigates the impact of the advisory guideline range; however, Mr. Lim respectfully asks the Court to sustain his objection to the four level role enhancement recommended in the PSR.  The government joins in this objection to the extent the PSR assesses a four level rather than a two level enhancement because, at the time the plea was negotiated, the government believed "there were not five or more participants in any one of the substantive counts" with which Mr. Lim was charged.  PSR at A-1.  The government also objects to proposed three-level leadership enhancements for defendants Cho and Park[2], who have not yet been sentenced.[3]

Mr. Lim respectfully objects to any leadership enhancement to his advisory guideline range.  There is no evidence here that Mr. Lim exercised the kind of hierarchical control or authority over other participants in the scheme that is required to support a role enhancement under U.S.S.G. § 3B1.1(a).  *See United States v. Quigley*, 373 F.3d 133, 139 (D.C. Cir. 2004) (reversing role enhancement despite recruitment and training of other participants because "the concept of 'control' or 'authority' [is] implicit in the notion of 'management' or 'supervision,' [and] connote[s] some sort of hierarchical relationship").  Although Mr. Lim worked in collaboration with other members of the scheme to achieve their common goals, he did not exercise decision-making authority over other participants.  *See United States v. Sayles*, 296 F.3d 219, 225-27 (4th Cir. 2002) ("district court clearly erred" in imposing role enhancement on drug distributor where evidence established no "exercise [of] decision making authority" over other

---

[2]  The government has recommended a sentence of 18 months for Mr. Park, despite his Category III criminal history and his involvement in multiple facets of the Khan bribery scheme.  *See* Government's Motion for Section 5K1.1 Downward Departure and Memorandum in Aid of Sentencing, *United States v. Park*, No. 12-cr-102-EGS (Oct. 10, 2014).

[3]  Defendant Kwon did receive a two level leadership enhancement at sentencing, as noted in the PSR, but he employed and supervised another member of the scheme and personally orchestrated her activities in furtherance thereof; Kwon was also a manager and a supervisor in a separate bank fraud conspiracy to which he pleaded guilty at the same time.

participants).  Nor was he "hierarchically superior" to other members of the scheme.  *See United States v. Carter*, 449 F.3d 1287, 1299 (D.C. Cir. 2006) (district court clearly erred in imposing role enhancement based on findings that defendant was "'a point of contact' for heroin for several people and that [he] had 'persons delegated to him,' not that [he] exercised authority over others or was 'hierarchically superior' to them"); *see also United States v. Martinez*, 584 F.3d 1022, 1026-29 (11th Cir. 2009) ("district court clearly erred in imposing a role enhancement" where defendant "orchestrated drug shipments," and "utilized other individuals to mail and receive drug shipments," because defendant did not "exercise[] decision-making authority" over other participants).  While Mr. Lim acknowledges that he had a substantial role as a government employee, there is no allegation that he directed or supervised the conduct of other government employees with whom he worked in connection with this offense.

Mr. Lim's conduct is not similar to the defendants' conduct in *United States v. Harvey*, 532 F.3d 326 (4th Cir. 2008).  In *Harvey*, the defendants "never exchanged money directly" and instead laundered bribes through "various family members and employees" who served as intermediaries.  *Harvey* at 331-32.  The Fourth Circuit upheld role enhancements in *Harvey* because "the district court specifically found that [two of those intermediaries], both of whom testified at trial, were participants in the criminal activity, and that [the defendants] were their organizers, leaders, managers, or supervisors."  *Id.* at 338.  Mr. Lim did not launder bribe proceeds through intermediaries, nor did he otherwise organize, lead, manage, or supervise his coconspirators.[4]

Though Mr. Lim's crimes are very serious, he played a limited role in a wide-ranging government contracting scandal that has been described on numerous occasions as "the largest

---

[4]  Similarly, in *United States v. Llamas*, 599 F.3d 381 (4th Cir. 2010), and *United States v. Bartley*, 230 F.3d 667, 673-74 (4th Cir. 2000), the defendants received role enhancements because they—unlike Mr. Lim—exercised supervisory responsibility over and directed the activities of others.

bribery and bid-rigging scheme in the history of federal contracting." *See*, *e.g.*, Ex. H (U.S. Department of Justice, Press Release (July 11, 2013)) (quoting U.S. Attorney Ronald C. Machen Jr.) (hereinafter "Khan Press Release").  According to the FBI, the ringleader of that scheme, Kerry Khan, "stole more than $30 million from the American taxpayer for his personal benefit." *Id.* (quoting Valerie Parlave, Assistant Director in Charge of the FBI's Washington Field Office). To date, at least 18 individuals and one corporation have pled guilty in connection with this scheme, and a dozen individuals have been sentenced.

This scheme began sometime in or after March 2006, when Mr. Khan was reassigned within the U.S. Army Corps of Engineers ("USACE") to work with Michael Alexander, and Mr. Khan and Mr. Alexander "agreed to work together to obtain USACE contracts for corrupt contractors who would pay bribes to Khan and Alexander . . . in exchange for Khan and Alexander exercising their official duties to direct USACE contracts to the contractors."  Khan Stmt of Offense ¶ 27; *see also*, Statement of Offense, *United States v. Alexander*, No. 11-cr-276-EGS ¶ 9 (D.D.C. Feb. 13, 2012).

Though Mr. Lim was introduced—by Mr. Khan—to individual members of Mr. Khan's conspiracy beginning in the spring of 2007, *see* Statement of Offense, *United States v. Park*, No. 12-cr-102-EGS ¶ 21 (D.D.C. June 20, 2012), Mr. Lim was not involved with most of the defendants who participated in the bribery scheme with Mr. Khan.

Likewise, though Mr. Lim committed serious crimes when he accepted bribes in excess of $490,000, he accepted a fraction—less than 2%—of the more than $26 million in bribes that Kerry Khan arranged to receive in exchange for his corruption of the contracting process. *Compare* Khan Stmt of Offense ¶ 31, *with* Lim Stmt of Facts ¶ 14.

6

Because Mr. Lim did not exercise hierarchical, decision-making authority over other participants, and in fact played a relatively limited role in Khan's sprawling fraud scheme, he respectfully objects to the application of any role enhancement under U.S.S.G. § 3B1.1(a).

**II.     The Sentencing Factors Under 18 U.S.C. § 3553(a) Counsel in Favor of A Sentence of No More Than Thirty-Six Months.**

    **A.     Mr. Lim's History and Characteristics Weigh Against A Harsh Sentence.**

Mr. Lim was born on April 7, 1966, in a one-room house in South Korea to hard-working parents who had only a few years of formal schooling between them.  After the Korean War, Mr. Lim's father worked his way up from shining shoes and arranging the display in a shoe store to become an apprentice and later a skilled shoemaker.

In 1974, Mr. Lim's parents moved their young family to Colorado in search of a better life for In Seon and his younger brother, In Su Lim.  A sickly child who struggled with terrible coughs from an early age, Mr. Lim's entry into the United States was delayed due to tuberculosis.

After arriving in the United States, Mr. Lim's parents pooled their limited resources with other recently immigrated family members, but they had trouble finding work.  In order to make ends meet, they both worked long hours at multiple jobs, leaving young In Seon to care for his younger brother.  *See* PSR ¶ 107.  From an early age, In Seon was responsible for getting his brother and younger cousins ready for school each morning and for bringing them home and feeding them dinner in the evenings.  *See* Ex. B.  As a child, In Seon also managed basic household chores, including the laundry, while his parents worked hard to put food on the table. *See* Ex. E (Letter from Song Lim) ("my son took care of his younger brother very well and helped me by doing housework since I was very busy").

To lessen the burden on his family, Mr. Lim began contributing his own wages to the family budget at an early age. Ex. B ("that was when I remember I started seeing my mother more often . . . [m]y brother would bring home his tips every night and his paycheck to mom"). Mr. Lim also paid for his own college and graduate education through a combination of paying jobs and scholarships. Ex. E ("[H]e didn't make us worry about his college tuition. He took care of it all by himself by receiving scholarships and by working as a teacher's assistant and an intern. He worked hard and studied hard."). And he continued to serve as a surrogate parent to his younger brother—providing a teenage In Su with his first car and welcoming In Su into his own home when In Su started getting into trouble as a young adult. *See* Ex. B ("he saved my life several times").

Mr. Lim completed multiple advanced technical degrees, PSR ¶ 116, and he worked hard to support his own young family.

Unfortunately, tragedy struck in 2001, when his wife, Susan Yu, was diagnosed with late-stage stomach cancer. Mr. Lim spent long hours caring for Susan during her illness and tending to their three young children. By the time Susan died, the family was near destitute—with their savings gone and daunting mounds of new debt.

After Susan's death, Mr. Lim accepted a position in South Korea in order to rebuild his life and to provide a stable home for his family.

Mr. Lim is an involved and caring parent, who has always helped his children succeed in school and extracurricular activities. *See* Ex. C ("I often ask my dad for advice . . . he helped me with schoolwork . . . or even played video games with us for hours on end"); *see also* Ex. D ("He taught me things right from wrong, while supporting me with things such as my academic studies and my extra-curricular activities.").

8

Since their return to the United States, Mr. Lim has been the family's sole breadwinner. His wife, Hui Yong Kim, has limited English skills and has not been able to find work. The children are well-adjusted, and two of them are attending college nearby—though their ability to continue doing so is threatened by Mr. Lim's impending incarceration. Also, as the eldest son, Mr. Lim is responsible for the care of his aging parents, who have lived with his family for the past eleven years.

Mr. Lim has never been in trouble with the law before. PSR ¶ 97-104. Given his personal history and the strong support of his family, a harsh sentence is not necessary to protect society or deter Mr. Lim from committing further crimes.

**B.      Mr. Lim Has Provided Substantial Assistance to The Government's Ongoing Investigation.**

Mr. Lim understands that the government will move for a downward departure under § 5K1.1 seeking a reduction of approximately 30% for Mr. Lim or a total sentence of 60 months imprisonment. Mr. Lim appreciates this motion and respectfully asks the Court to grant it but seeks a somewhat lower sentence. Mr. Lim has met with the government on multiple occasions and has provided substantial assistance to the government.

Mr. Lim's cooperation should be taken into account at sentencing. Though, as explained above, Mr. Lim did not play a large role in the Khan bribery scheme, it bears emphasizing that several of those defendants received substantial reductions for cooperation, reductions of 37 percent on average and ranging as high as 48 percent (see chart on p. 14, *infra*).

**C.      A Thirty-Six Month Sentence Is Sufficient to Deter Mr. Lim and Other Potential Offenders.**

General deterrence has already been achieved here, and it will not be increased by imposing a longer sentence on Mr. Lim. Empirical research corroborates the simple fact that convictions, standing alone, have the greatest deterrent effect. The most effective deterrent in

these related cases is the fact that 18 individuals and one corporation have already been

convicted in relation to the Khan bribery scheme—with more convictions likely in the coming

months.  Scientific research consistently demonstrates that while the certainty of being caught

and punished has a deterrent effect, increasing the "severity of punishment[] do[es] note yield

significant (if any) marginal deterrent effects."  Michael Tonry, *Purposes and Functions of*

*Sentencing*, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels . . .

reached that conclusion, as has every major survey of the evidence."); *see also* Zvi D. Gabbay,

*Exploring the Limits of the Restorative Justice Paradigm:  Restorative Justice and White Collar*

*Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is

empirically known to be a far better deterrent than its severity.").

The U.S. Department of Justice National Institute of Justice agrees that the "[t]he

*certainty* of being caught is a vastly more powerful deterrent than the punishment."  Ex. I

(National Institute of Justice "Five Things About Deterrence") (also noting that "prison

sentences are unlikely to deter future crime") (emphasis in original).  In fact, a review of the

scientific literature demonstrates that "correlations between sentence [length] and severity of

crime rates . . . [are] not sufficient to achieve statistical significance."  Andrew von Hirsch, *et al*.,

*Criminal Deterrence and Sentence Severity:  An Analysis of Recent Research*, at 2 (1999); *see*

*also*, *id.*, at 1 ("the studies reviewed do not provide a basis for inferring that increasing the

severity of sentences is capable of enhancing deterrent effects").

Research regarding white collar offenders—such as Mr. Lim—in particular found no

difference between the deterrent effects of probation and those of imprisonment.  *See* David

Weisburd, *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar*

*Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive

10

evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").  As the Sentencing Commission itself has concluded, "a short but definitive period of confinement for a larger proportion of these 'white collar' cases . . . achieve[s] deterrence."  *See* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing*, at 56 (2004); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("[t]here is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders").

### D.  Mr. Lim Poses Little or No Future Risk to Society.

To determine the sentence that is sufficient but not greater than necessary to protect the public from further crimes by Mr. Lim, this Court should consider the statistically low risk of recidivism presented by individuals with Mr. Lim's personal history and characteristics.  *See*, *e.g.*, *United States v. Darway*, 255 F. App'x. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 323 F. App'x. 27, 31 (2nd Cir. 2009) (concluding that "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age).

As previously noted, Mr. Lim is 48 years old, a first offender, and a college graduate with a post-graduate degree.  He has been gainfully employed throughout his adult life, is married with children, and has no history of drug or alcohol abuse.

Like others "with zero criminal history points," Mr. Lim is much "less likely to recidivate than all other offenders."  *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting downward variance based on lack of criminal history).  By way of example only, offenders with no criminal history points have a rate of recidivism that is *half* that of offenders

11

with only one criminal history point.  *See* Sent'g Comm'n, *Recidivism and the "First Offender,"* at 13-14 (May 2004) [hereinafter "*First Offender*"].

Moreover, the guidelines do not "account for the length of time a particular defendant[—such as Mr. Lim—]refrains from criminal conduct" before committing his first offense.  *United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting downward departure based on defendant's age as first-time offender).  For all male offenders in criminal history Category I, the recidivism rate is 15.2 percent; however, for those over age 50 at the time of sentencing, the rate in Category I is only 6.2 percent.  *See* U.S. Sent'g Comm'n*, Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines*, Exs. 9 & 10 (May 2004) [hereinafter "*Measuring Recidivism*"].

The Sentencing Commission has recognized the merit of revising the guidelines to take age and first offender status into account.  *See First Offender*, at 1-2 (identifying a goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"); *Measuring Recidivism*, at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines . . . if incorporated into the criminal history computation").

However, the Sentencing Commission has not yet implemented any such revisions to its guidelines.  Instead, it has recently stated that age "may be relevant" in granting a departure.  *See* U.S.S.G. § 5H1.1 (*postscript*).

Mr. Lim is extremely unlikely to pose any future risk to society because he is well educated, he has a strong employment history, he has been and is married, he has no history of substance abuse, *and* he is close to 50 years old.  *See Measuring Recidivism*, Exs. 9 & 10 (May 2004) (documenting measurable drops in recidivism associated with each of these individual

characteristics:  receipt of college degree, employment history, marital history, absence of drug history, and age at sentencing).  Also, according to "the best available evidence . . . prisons do not reduce recidivism more than noncustodial sanctions."  Francis T. Cullen, *et al.*, *Prisons Do Not Reduce Recidivism:  The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

This Court should therefore reduce any sentence it deems necessary here to account for Mr. Lim's extremely low risk of recidivism.  *See United States v. Urbina*, 2009 WL 565485, at *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age).

**E.     The Court Must Avoid Unwarranted Sentencing Disparities.**

This Court must avoid creating unwarranted sentencing disparities among defendants with similar criminal histories who are convicted of similar criminal conduct.  *See* 18 U.S.C. § 3553(a)(6).  It must also avoid unwarranted *similarities* in sentencing among defendants who are different in ways not accounted for in the guideline range.  *See Gall v. United States*, 552 U.S. 38, 55 (2007) ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated").

**1.   A Sentence of 36 Months Will Place Mr. Lim Properly Within The Context of Khan's Larger Bribery Scheme.**

When viewed in light of Mr. Lim's personal circumstances and relative culpability, the sentences imposed on other defendants connected to Khan's larger scheme illustrate why a sentence above thirty-six months would create an unwarranted sentencing disparity in this case.

13

As previously noted, Khan's bribery scheme—and his offense—was exponentially different in scope from Mr. Lim's.  The Khan scheme is consistently described as "the largest domestic bribery and bid-rigging scheme in the history of federal contracting."  *See, e.g.*, Ex. H (Khan Press Release).  The Khan scheme not only involved more than $30 million dollars in bribery and kickbacks, it also impacted more than $1 billion in government contracts.  The table below illustrates how individuals related to the Khan scheme have been sentenced to date:

| Defendant | Restitution | 5K1.1 Reduction | Sentence |
|---|---|---|---|
| Khan, Kerry[*] | $32,553,252.93 | 10% | 235 months |
| Babb, Harold | $9,405,230.70 | 36% | 87 months |
| Alexander, Michael[*] | $1,250,000.00 | 33% | 72 months |
| Miller, James | $9,405,230.70 | 48% | 70 months |
| Kwon, Thomas[**] | $1,188,500.00 | 47% | 46 months |
| Khan, Lee | $401,000.00 | N/A | 37 months |
| McKinney, Robert | $984,663.20 | 42% | 33 months |
| Corbett, Larry | $0.00 | 41% | 27 months |
| Woo, Helen | $0.00 | N/A | 24 months |
| Khan, Nazin | $611,04.00 | N/A | 24 months |
| Hallas, Ted | $0.00 | 40% | 18 months |
| Chong, Chae | $0.00 | N/A | 2 years probation |

[*] denotes individuals who were government employees, rather than contractors, during the relevant time period

[**] as previously noted, *see supra* note 3, Kwon simultaneously pleaded guilty to a separate bank fraud conspiracy

Mr. Lim's restitution has been set at $374,566.58, lower than any Khan coconspirator who has been sentenced to date (where restitution was at issue).  As previously noted, Mr. Lim received less than 2% of the total bribery amount Khan arranged to receive.  And the government has recently recommended a sentence of only 18 months for a Khan coconspirator who has a Category III criminal history and multiple points of contact with the larger Khan scheme.  *See*

14

*supra* note 2.

A sentence of 36 months (after § 5K1.1 reduction) will ensure that Mr. Lim is punished more severely than Khan coconspirators with similar restitution figures—as is appropriate, given Mr. Lim's heightened responsibilities as a government employee.  However, it will avoid the unwarranted disparities that a higher sentence would create, given Mr. Lim's personal characteristics and relative culpability.

### 2.   A Sentence of 36 Months Will Place Mr. Lim Properly Within The National Spectrum of Bribery Sentences.

It is important to note that "18 U.S.C. § 3553(a)(6) is aimed primarily at eliminating *national* sentencing inequity, not differences between co-defendants."  *United States v. Rich*, — F. App'x —, 2014 WL 2958806 at \*1 (4th Cir. Jul. 2, 2014) (emphasis added); *see also United States v. Kant*, 946 F.2d 267, 270 n.3 (4th Cir. 1991) ("[T]he uniformity sought by § 2C1.1 is uniformity among the universe of bribery convictions, even at the temporary cost of some apparent disparity in the sentencing of coconspirators in an individual case.").

The national average for bribery sentences is 22 months.  *See* U.S. Sent'g Comm'n, *2013 Sourcebook of Federal Sentencing Statistics*, tbl.13.

In 2013, more than 60% of bribery defendants received sentences below their guideline ranges, and nearly half of those departures were *not* government sponsored (33.6 percent of bribery defendants received government-sponsored downward departures).  *See id.* at tbl. 27.

A sentence of thirty-six months would also be consistent with other bribery sentences imposed in the Eastern District of Virginia.

For example, in *United States v. Hand* (2:10-cr-154), the defendant—a military officer— was a senior advisor to a Regional Support Unit in Iraq who acted in a contract oversight and advisory capacity to Iraqi security forces in matters of life support, defense, facilities, and

operations.  In that capacity, the defendant facilitated the receipt of military contracts in Iraq worth several hundred thousand dollars in exchange for an interest in the receiving company. Unlike Mr. Lim, the defendant in *Hand* committed his offenses in an active war zone. Nonetheless, he was sentenced to 36 months.

In *United States v. Holder* (2:10-cr-114), the defendant—a naval officer—was working as a supply petty officer and purchasing agent for the main operating room of the Naval Medical Center Portsmouth.  In that capacity, the defendant received approximately $40,000 in various items and cash from medical sales representatives for the award of purchase orders for medical supplies.  The defendant was sentenced to five years of probation.

To avoid unwarranted national and case-specific sentencing disparities, this Court should sentence Mr. Lim to no more than thirty-six months.

## III. Mr. Lim's Guideline Range Provides Little Useful Advice Because It Is Not Based on Empirical Evidence or National Experience and Fails to Promote Any Purpose of Sentencing.

Mr. Lim's Guidelines range is driven largely by a single enhancement under § 2C1.1(b)(2), which references the § 2B1.1(b)(1) loss table.  This enhancement—based on the $490,000 in bribes that Mr. Lim received—results in a 14-level increase and effectively doubles Mr. Lim's base offense level, which was already at 14.  While some increase based on bribe amount is appropriate, Mr. Lim's Guidelines range has increased eleven levels as a result of changes to the bribery Guidelines calculations that were not based on empirical evidence or any analysis of § 3553(a) factors.

The Supreme Court has recognized that when the Commission premises a guideline on considerations other than empirical evidence and the  § 3553(a) factors, a sentencing court may give less deference to the guideline.  *See Kimbrough*, 552 U.S. at 109-10 (holding that where guideline is not product of "empirical data and national experience," courts do not abuse

16

discretion by rejecting guideline, "even in mine-run case").  The Fourth Circuit has also

concluded that courts are "free to consider policy decisions behind the Guidelines, including the

presence or absence of empirical data[.]"  *United States v. Nolasco-Ramirez*, 391 F. App'x 309,

311 (4th Cir. 2010).

> **A.      There Is Little or No Empirical Basis for The Guidelines' Extreme Emphasis
> on Bribe Amount.**

Before the guidelines, first offenders convicted of receiving bribes totaling more than a

million dollars in exchange for official acts, who were sentenced to prison, served, on average, 6

to12 months.  Twenty percent of such defendants received probation.  *See* U.S. Sent'g Comm'n,

*Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* 30 (1987).

Although the initial Guidelines calibrated sentences to the total loss or bribe amount

based on empirical data, there have since been several significant increases to the § 2B1.1 table

that were not based on any empirical data.  *See* U.S. Sent'g Comm'n, *Supplementary Report on

the Initial Sentencing Guidelines and Policy Statements* (1987) (explaining how initial guidelines

were created).  In 2001, and again in 2003, the penalties under § 2B1.1 were dramatically

increased in reaction to several high-profile corporate scandals.  And the base-offense level

under § 2C1.1 was raised in 2004 for similar reasons.  None of these dramatic increases were

based on any analysis of empirical evidence demonstrating that sentences in fraud or bribery

cases were not already sufficiently lengthy to effectively deter, or to otherwise satisfy the §

3553(a) factors.

These substantial and unjustified changes to the bribery guidelines have increased Mr.

Lim's advisory guideline range by eleven levels:  Mr. Lim's enhancement for loss amount

jumped seven levels between 1990 and 2003 and his base offense level increased an additional

four levels in 2004; all without any empirical justification.  These increases—before other

enhancements are applied—correspond to a 54-month increase at the low-end of Mr. Lim's range and a 67-month increase at the high end.  The Commission has thus tripled Mr. Lim's Guidelines range in the twenty-six years since the Guidelines were first adopted, without the support of sufficient empirical data demonstrating the value of this increase.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (noting "inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss . . . without, however explaining why it is appropriate to accord such huge weight to such factors").

In fact, the Sentencing Commission has dramatically increased sentence length for bribery offenders in spite of overwhelming social science research showing that such increases in severity have little, if any, deterrent value.  As described more fully, above, empirical research since the Guidelines were first adopted has continued to show that, while certainty of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

### B. The Enhancements Here Are Grossly Disproportionate Relative to Enhancements in Other Cases.

The simple fact that there is no other double-digit offense-specific enhancement anywhere in Sections 2A ("Offenses Against the Person') or 2B ("Basic Economic Offenses") of the Guidelines illustrates how disproportionate the bribery guidelines are.

The Guidelines take into account the seriousness of an underlying offense by setting a base offense level.  Likewise, the Guidelines take into account the seriousness of an aggravating factor by applying a corresponding enhancement.  But by generating an offense level of 28, before any other adjustments, the Guidelines accord Mr. Lim a sentencing range higher than those for offenses that create more significant dangers to society, including some violent

18

offenses.  For example, bombing of an airport, aircraft, or mass transit facility results in a base

offense level of 24.  *See* U.S.S.G. § 2K1.1(a)(2).  Distribution for pecuniary gain of child

pornography involving a minor younger than 12 results in an offense level of 25.  *See* U.S.S.G. §

2G2.2(a)(1).  And aggravated armed assault with a discharged firearm resulting in life-

threatening bodily injuries results in an offense level of 26.  *See* U.S.S.G. § 2A2.2.

It is manifestly unreasonable to assign a higher punishment to a bribery defendant than to

those who commit more serious, violent crimes.

### C.      The Majority of Courts—Including Those in This District—Depart From The Inflated Bribery Guidelines.

As previously noted, a significant majority of bribery defendants are sentenced below

their presumptive Guidelines ranges.

By way of example only, in December 2013, Judge O'Grady imposed sentences far

below the bottom of the guideline range for two fraud defendants.  *See United States v. McGrade*

(1:13-cr-185).  The defendants in *McGrade*, Brian Collinsworth and Kathleen McGrade, were

convicted of defrauding the U.S. Department of State of over $50 million.  The sentences were

based on a loss amount of $7 million, and so each defendant received a 20-level enhancement

under § 2B1.1.  This resulted in a range of 51 to 63 months for Collinsworth and 70 to 87 months

for McGrade.  Neither defendant cooperated with the government, but Collinsworth still received

a sentence of only 18 months and McGrade received a sentence of 24 months.  At sentencing, the

court explained that lower sentences were imposed because the Guidelines ranges overstated the

severity of the offenses in question.

Similar departures are seen in non-bribery fraud cases, where Guidelines ranges are also

calculated based on the inflated § 2B1.1 table.  In *United States v. Conteras* (1:10-cr-296), the

defendant pled guilty to conspiracy to commit wire fraud and aggravated identity theft with a

loss amount in excess of $1 million, and was sentenced to 24 months of imprisonment.  And in *United States v. Gezachew* (1:10-cr-199), the defendant pled guilty to conspiracy to commit bank fraud with a loss amount in excess of $18 million, and was sentenced to 30 months of imprisonment.

Justice requires a similarly substantial downward variance here.

## CONCLUSION

For the foregoing reasons, Mr. Lim respectfully submits that a sentence of no more than thirty-six months is sufficient to accomplish the purposes of sentencing.  Mr. Lim also respectfully requests that no fine be imposed, given the substantial amount of restitution involved here.

Respectfully submitted,

IN SEON LIM

By Counsel,

Michael S. Nachmanoff,
Federal Public Defender

By:  _____/s/_____
Michael S. Nachmanoff, Esquire
Federal Public Defender
Virginia Bar No. 39180
Nicholas J. Xenakis
(admitted *pro hac vice*)
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0848 (telephone)
(703) 600-0880 (facsimile)
Michael_Nachmanoff@fd.org

Rebecca Gray, Esquire
(*pro hac vice* admission pending)
District of Columbia Bar No. 996350
GRAYLEGALPLLC

20

1250 Connecticut Avenue NW, Suite 200
Washington, DC  20036
(202) 677-5409 (telephone)
(202) 521-0615 (facsimile)
rgray@graylegal.com

*Attorneys for In Seon Lim*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 18th day of October, 2014, I will electronically file the

foregoing memorandum in aid of sentencing with the Clerk of the Court using the court's

electronic filing system, which will then send a notification of such filing to:

> Jack Hanley, Esquire
> Assistant U.S. Attorney
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
> (703) 299-3700

A copy of this memorandum will also be served, *via* interoffice mail, upon United States

Probation Officer William C. Byerly.

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of this

document will be delivered to Chambers within one business day of its electronic filing.

> _____/s/_____
> Michael S. Nachmanoff, Esquire
> Virginia Bar No. 39180
> Federal Public Defender
> Office of the Federal Public Defender
> 1650 King Street, Suite 500
> Alexandria, Virginia 22314
> (703) 600-0848 (telephone)
> (703) 600-0880 (facsimile)
> Michael_Nachmanoff@fd.org
>
> *Attorney for In Seon Lim*